In the Matter of **HARVARD INDUS-TRIES, INC.,** Individually and d/b/a **Elastic Stop Nut (ESNA)** and also d/b/a **Harvard Interiors, et al., Debtors.**

**Bankruptcy Nos. 91–404 and 91–479 to 91–487.**

United States Bankruptcy Court, D. Delaware.

March 10, 1992.

Sheldon Schachter, Stuart G. Brecher, Glenn R. Reiser, Roseland, N.J., Anthony W. Clark, David M. Augustine, Wilmington, Del., for debtors.

Edwinna C. Vanderzanden, Hale Schoolhouse, Dover, N.H., Jeremy W. Homer, Dover, Del., for Town of Newmarket.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy.

The Town of Newmarket, New Hampshire filed a proof of claim against debtor-in-possession Harvard Industries, Inc. and its nine subsidiaries. Harvard objects to the claim on multiple grounds, and seeks favorable rulings as a matter of law. A hearing on these objections, except the alternative motion to estimate Newmarket's claim pursuant to § 502(c), was held and concluded on February 10, 1992. This is the court's decision on these objections. This is a core proceeding. 28 U.S.C. § 157(b)(2)(B).

### I. *Facts*

The parties admitted certain facts during the hearing, and through the pleadings, briefing and a stipulation.[1] In addition, evidence was permitted to assist the court in ruling upon Harvard's objections. However, while the court appreciates this presentation of evidence as assisting the court in understanding the overall context of the legal issues, all of the court's rulings herein rely solely upon undisputed facts.

The Town of Newmarket owns and operates a solid waste landfill located, not surprisingly, in Newmarket, New Hampshire. The Kingston–Warren Corporation, a wholly owned subsidiary of Harvard Industries, owned and operated a manufacturing facility located in Newfields, New Hampshire for over 40 years. Before the shutdown of the facility, Kingston–Warren generated solid and liquid hazardous and non-hazardous wastes. From approximately 1952 to 1975, Kingston–Warren deposited these wastes at the Newmarket landfill. In particular, Kingston–Warren brought its liquid waste chemicals to the Newmarket site in 55–gallon drums and emptied these drums into the site.

Kingston–Warren also used 55–gallon drums to transport chemical wastes. These drums were buried at the Newmarket site. It is not known whether these drums remain intact.

Some of Kingston–Warren's waste chemicals entered into and contaminated the soils and groundwater at the site. The contamination continues to this day. Newmarket and Harvard allege other entities have also contributed to contamination at the site. On January 11, 1985, the Department of Health and Welfare for the State of New Hampshire ordered the Town of Newmarket to close its landfill by September 1, 1985. To date, however, neither the State nor the United States Environmental Protection Agency have been involved in the cleanup of the landfill.

Cleaning up the Newmarket landfill first requires investigation into the nature and extent of the contamination. Kingston–Warren and the other potentially responsible parties (PRPs) agreed to participate in an environmental study of groundwater contamination and drum remediation at the Newmarket site.

### II. *Newmarket's Proof of Claim*

Newmarket's original proof of claim stated the claim was based upon "the administrative costs of hazardous waste cleanup for materials generated by the Debtor." The claim further alleged that "materials identified to Debtor will cost approximately $3,000,000 to secure and/or remediate." Newmarket's briefing states two alternative legal bases for this claim: 42 U.S.C. § 9607 (Supp.1991) (CERCLA), and N.H.Rev.Stat. Ann. Ch. 147–A (Supp.1983).

After the February 10 hearing on Harvard's objections to the claim, Newmarket filed an amended claim detailing its response costs. "Response" costs are defined in CERCLA as costs for "removal" or "remedial action." 42 U.S.C. § 9601(25) (Supp.1991). Harvard does not dispute this definition includes investigative costs.

The amended claim alleges $301,332.42 in response costs were incurred before the date of Harvard's Chapter 11 petition (April 30, 1991). $1,754,071.45 are alleged as incurred postpetition costs. The claim

---

1. Newmarket filed a request for findings of fact and rulings of law (docket no. 776). Harvard admitted paragraphs 1–18, 27, 28, 30–33, 36–40, 43, 44, 49–51, 54, and 55 of this document.

also alleges $17,150,000 in anticipated costs to be incurred post-confirmation (no order of confirmation presently exists in these chapter 11 proceedings). These costs total $19,205,403.88. The court notes that Newmarket has abandoned certain claims for legal fees that appeared in its original claim. The claim asserts the Debtors' allocable share is 50% of the total costs, or $9,602,701.94.

The bar date (September 2, 1991) has passed, and neither the EPA nor the State of New Hampshire has filed a proof of claim relating to the Newmarket site.

### III. *Discussion*

#### A. Harvard's § 502(b)(1) objection

Harvard's first ground in support of its objection to Newmarket's claim is based upon 11 U.S.C. § 502(b)(1) (Supp.1991), which states in relevant part that a claim shall be disallowed "to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." Harvard asserts, without any supporting legal argument, that as among the debtors, only Kingston–Warren is a PRP, and Harvard and the other subsidiary debtors should be deemed not liable to Newmarket as a matter of law.

The "applicable law" here is the federal common law that determines whether a parent corporation is liable under CERCLA for the actions of its subsidiary, *e.g., Mobay Corp. v. Allied–Signal, Inc.,* 761 F.Supp. 345, 353 (D.N.J.1991), and New Hampshire law that determines parent liability under N.H.Rev.Stat. Ch. 147–A. Newmarket points out, and the court agrees, that the present record is not sufficiently developed to attempt to apply these respective federal and state standards to determine Harvard Industries' liability.

Newmarket has not argued, however, that under the applicable law, the other subsidiaries might be liable. To this extent, therefore, Harvard's objection is sustained.

Harvard also argued in support of its § 502(b)(1) objection that Newmarket had not incurred any response costs, or that it could not "possibly meet its evidentiary burden." In light of admissions made by Harvard in this proceeding, this position is without merit. Moreover, it is unbelievable that Harvard could reasonably expect this court, consistent with due process, to uphold such a conclusory assertion without any opportunity for the opposing party to present evidence.

Finally, Harvard argues that future response costs should be estimated at zero. Resolution of this issue is contained in section IV, *infra.*

#### B. Harvard's divisibility argument

Harvard argues under the auspices of § 502(b)(1) that its liability is divisible from that of the other Newmarket site PRPs. Newmarket has already conceded in its amended proof of claim that the liable Debtors are responsible for at most 50% of its response costs. If Harvard wishes to further limit the percentage of its liability, it must prove such percentage at a subsequent evidentiary hearing. *United States v. Marisol, Inc.,* 725 F.Supp. 833, 842 (M.D.Pa.1989).

#### C. The contingent portion of Newmarket's claim is not subject to disallowance pursuant to § 502(e)(1)(B)

Harvard argues the contingent portion of Newmarket's claim should be disallowed pursuant to 11 U.S.C. § 502(e)(1)(B) (Supp. 1991). That section states in relevant part:

(e)(1) [T]he Court shall disallow any claim for reimbursement and contribution of an entity that is liable with the debtor on ... the claim of a creditor, to the extent that—

\* \* \* \* \* \*

(B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution ...

Of relevance here, this section prevents double payment by the estate of the same underlying liability. *In re Amatex Corp.,* 110 B.R. 168, 171 (Bankr.E.D.Pa.1990).

The leading case in this Circuit applying this section to environmental claims is *In re Allegheny Int'l, Inc.*, 126 B.R. 919 (W.D.Pa.1991), *aff'd without opinion*, 950 F.2d 721 (3d Cir.1991). Both parties cite this case as supporting their opposing positions.

Harvard's motion with respect to each legal basis for Newmarket's claim will be discussed separately.

### 1. *The Claim based upon CERCLA*

In *Allegheny,* AL Tech filed a proof of claim asserting the debtor, Allegheny International, was liable for response costs already incurred and yet to be incurred for the investigation and remediation of hazardous wastes at two sites. AL Tech contended that the waste sites arose in whole or in part during the debtor's ownership of these properties. AL Tech asserted two grounds for debtor's liability, 42 U.S.C. § 9607(a)(4)(B) of CERCLA, and an environmental New York statute (Oil Spill Act). The debtor moved for disallowance pursuant to § 502(e)(1)(B). 126 B.R. at 920–21.

The United States District Court in *Allegheny* employed a three step analysis to determine the merits of the debtor's motion. First, it considered whether § 502(e)(1)(B) applies to *direct* contingent claims. After reviewing the language and history of the statute, the *Allegheny* court held that this section does not apply to direct contingent claims, and that "only claims involving joint or secondary liability owed to a third-party creditor are [disallowed]." *Id.* at 921–22.

The second step was whether the substantive law recognized a direct claim by one PRP against another. As to the Oil Spill Act, the parties had not briefed the issue, and the District Court declined to rule without further proceedings below. As to AL Tech's claim based upon CERCLA, the court reviewed the law, observed that 42 U.S.C. § 9607(a) creates a private cause of action, and concluded that this section does allow "a direct action for recovery of response costs incurred by a nongovernmental entity." *Id.* at 922–23 (footnote omitted).

The third step was whether AL Tech's claim was indeed such a direct claim or merely a disguised claim based upon joint or secondary liability. The *Allegheny* court reasoned that:

> AL Tech does not seek to recover sums owed to a third party such as the EPA or [New York Department of Environmental Conservation], but instead seeks to recover sums it has personally expended and will personally expend in the future to remediate hazardous waste at the [two] sites.... [T]he distinction between a cleanup performed by AL Tech and a cleanup performed by the EPA is *crucial*.... Section 502(e)(1)(B) is not a means of immunizing debtors from contingent liability, but instead protects debtors from multiple liability on contingent debts.

*Id.* at 923 (emphasis added). The court concluded that a claim under § 9607(a)(4)(B) cannot be disallowed by § 502(e)(1)(B). *Accord In re Dant & Russell, Inc.*, 951 F.2d 246, 248–49 (9th Cir. 1991) (section 502(e)(1)(B) does not apply to disallow PRP's claim for cost of future cleanup that was not ordered by EPA).

Finally, the court acknowledged that double liability could occur if AL Tech failed to clean up the sites and the EPA subsequently brought an action against the debtor. The District Court observed the bankruptcy court's equitable powers could be used to eliminate this problem. In particular, it approved the use of a trust fund mechanism—distribution on AL Tech's claim could be placed in a trust to be expended directly for the remediation of the waste sites. *Id.* at 924. This would eliminate the possibility of debtor exposure to multiple liability, and unjust enrichment to the PRP.

The *Allegheny* case controls the legal issues Harvard and Newmarket raise here in connection with Newmarket's CERCLA claim. Section 9607(a) allows direct claims by one PRP against another. Newmarket's claim is for past and future response costs *it* has incurred or will incur *itself,* based upon the same section of CERCLA. The EPA is not involved in the cleanup.

Newmarket's claim is therefore a direct claim. The claim is not subject to disallowance under § 502(e)(1)(B).

### 2. *The Claim based upon New Hampshire Law*

The three step analysis of *Allegheny* also applies to Harvard's § 502(e)(1)(B) motion to disallow Newmarket's claim based upon New Hampshire law. However, while *Allegheny* answers the first question of the three step analysis, the second question must be resolved with reference to New Hampshire law and the facts of this case.

Newmarket's state law claim is based upon N.H.Rev.Stat. Ch. 147–A (Supp.1983) a comprehensive statute dealing with hazardous waste management. In particular, N.H.Rev.Stat. § 147–A:9 states in relevant part:

> Any operator, generator, or transporter who causes or suffers the treatment, storage, transportation or disposal of hazardous waste in violation of RSA 147–A ... shall be strictly liable for costs directly or indirectly resulting from the violation relating to:
>
> (a) Containment of hazardous wastes;
>
> (b) Necessary clean up and restoration of the site and the surrounding environment; and
>
> (c) Removal of the hazardous wastes.

The attorney general may enforce the statute's provisions. N.H.Rev.Stat. § 147–A:14. More importantly, the New Hampshire Supreme Court has clearly stated that this statute creates a private cause of action. *Bagley v. Controlled Environment Corp.*, 127 N.H. 556, 503 A.2d 823 (1986). Therefore, New Hampshire law recognizes a direct claim by Newmarket against the liable Debtors for cleanup and restoration costs.

As to the third step, the reasoning of *Allegheny* applies with equal force here. Newmarket seeks to recover costs it has expended or will expend itself. The State of New Hampshire is not involved in the

cleanup. This claim cannot be disallowed under § 502(e)(1)(B).

In connection with both bases for Newmarket's claim, the same concern arises here as in *Allegheny* relating to the possible subsequent involvement at the Newmarket site of the U.S. E.P.A. or the State of New Hampshire. Both Harvard and Newmarket have suggested, and the court agrees, that Harvard establish a trust fund for distribution on Newmarket's claim.

### IV. *Harvard's Motion for Estimation will go Forward*

Harvard has moved in the alternative for estimation of Newmarket's claim. Newmarket does not oppose, and in fact vigorously supports this motion (although it does disagree as to what the estimated value should be). Pursuant to this court's scheduling order of February 27 (docket no. 823), this motion was placed on the April 8 calendar. Absent a different request from the parties, that scheduling shall remain.[2]

### V. *Conclusion*

An order in accordance with this Memorandum Opinion is attached.

### ORDER

AND NOW, March 10, 1992, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT:

1. The motion of the Debtor to expunge the subsidiaries Elastic Stop Nut, Harvard Interiors, Hayes–Albion Corporation, Harvard Transporation Corporation, Harman Automotive, Inc., Harman Automotive–Puerto Rico, Inc., Trim Trends, Inc., Deckerville Die Form Company, Birmingham Benders Co. and Snover Stamping Company from the proof of claim of the Town of Newmarket is GRANTED.

---

**2.** As indicated in a February 27, 1992 scheduling order, there are presently other pending motions of Harvard relating to other CERCLA sites that raise identical legal issues to those discussed in this opinion. The court has no factual record before it with respect to those other motions, and takes no position on the proper resolution of those motions.

2. The motion of the Debtor to expunge Harvard Industries, Inc., from the proof of claim is DENIED, without prejudice to renew.

3. The motion of the Debtor to disallow the claim of the Town of Newmarket pursuant to 11 U.S.C. § 502(e)(1)(B) is DENIED.