**In re TRI–UNION DEVELOPMENT CORPORATION, et al., Debtors.**

No. 03–44908–H1–11.

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Sept. 9, 2004.

612

Patrick L. Hughes, JoAnn Lippman, Eric B. Terry, Haynes & Boone, LLP, Houston, TX, Paul Joseph Goodwine, Schully, Robberts, Slattery, Jaubert & Marino, PLC, New Orleans, LA, for Tri–Union Development Corp., et al.

Nancy Lynne Holley, Houston, TX, U.S. Trustee.

Mark Wayne Mehnert, Phil F. Snow, Jr., Ware Snow, Fogel & Jackson, LLP, Houston, TX, for Creditor Committee.

Philip G. Eisenberg, Mark A. Chevez, Omer F. Kuebel, III, Elizabeth C. Freeman, Locke, Liddell & Sapp, Houston, TX, for Greenwich Insurance Co. and BP Exploration and Production, Inc.

Robin B. Cheatham, Lisa Merz, Dean Ferguson, Adams and Reese, LLP, New Orleans, LA, for Apache Corp.

Kelley Abbott Hammon, Mickinney & Cooper, LLP, Houston, TX, for Mariner Energy, Inc.

William L. Wallander, Duston K. McFaul, Vinson and Elkins, Dallas, TX, for Ad Hoc Committee of Majority Noteholders.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

MARVIN ISGUR, Bankruptcy Judge.

The Debtors' Motion for Summary Judgment Regarding Objection and Motion for Order Disallowing Contingent Claims is granted in part and denied in part. Greenwich Insurance Company's Cross Motion for Summary Judgment is denied.

### Background

Tri–Union Development Corporation and Tri–Union Operating Company (here-

inafter "Debtors" or "Tri–Union")[1] are oil and gas exploration, development, and production companies with oil and natural gas reserves located in Texas, the Gulf of Mexico, and California. Tri–Union previously filed for protection under Chapter 11 of the Bankruptcy Code in March of 2000. Tri–Union emerged from its prior bankruptcy case under a confirmed plan of reorganization in June, 2001. The present bankruptcy case was commenced on October 20, 2003. The case was referred to the Bankruptcy Court pursuant to the District Court's standing order of reference.[2]

Tri–Union owns and operates offshore oil and gas blocks and related ancillary personal property comprising drilling production facilities, pipelines, and well bores located in the Gulf of Mexico on the Outer Continental Shelf (the "OCS Properties").[3] The OCS Properties are generally leased from, and regulated by, the Minerals Management Service ("MMS"). The Debtors are—or were—also parties to various joint operating and similar development agreements affecting the OCS Properties.[4]

As the owner or operator of offshore oil and gas wells, platforms, and other production facilities, Tri–Union had certain obligations to plug and abandon several offshore wells, remove offshore oil and gas platforms, pipelines, and facilities, conduct site clearance operations, and perform additional decommissioning activities (the "Offshore P & A Obligations"). The parties dispute whether the Debtors' Offshore P & A Obligations remain enforceable in this bankruptcy case.

Under the prior confirmed plan, Tri–Union was required to post surety bonds to assure the satisfaction of the Offshore P & A Obligations. Effective on July 2, 2001, Tri–Union, as obligor, arranged the issuance of surety bonds from Greenwich Insurance Company ("Greenwich") in favor of the MMS, as beneficiary. The surety bonds in favor of the MMS, and for the benefit of Tri–Union, are required by applicable federal regulations. *See* 30 C.F.R. § 256.52, *et seq.* These bonds include a $3 million area-wide surety bond and various supplemental bonds in the aggregate amount of $9.75 million (the "Surety Bonds"). Tri–Union collateralized the Surety Bonds with approximately $4.5 million.[5] The MMS may call the Surety Bonds if it determines that Tri–Union is unable to fulfill its offshore P & A Obligations. 30 C.F.R. 256.59. MMS has requested that Tri–Union commence Offshore P & A Operations for various properties.[6]

---

1. Although there are two debtors, their cases are being jointly administered.

2. The bankruptcy case was originally assigned to Bankruptcy Judge Greendyke. Prior to his departure from the bench, Judge Greendyke recused and the bankruptcy case was assigned to this Judge.

3. Some of the properties in dispute are no longer owned or operated by the Debtors.

4. The following companies are either co-lessees or predecessors in interest (as defined by state and federal regulations discussed *infra*) to oil and gas leases either currently operated or formerly operated by Tri–Union. These Companies include Apache Corporation, BP Exploration and Production, Inc.,

and Mariner Energy, Inc. (as defined in Debtors' Motion the "Co–Lessees and Predecessors in Title.") Each of the Co–Lessees and Predecessors in Title have filed proof of claims in this case for plugging and abandonment obligations arising under various agreements with Tri–Union and MMS regulations.

5. On May 20, 2004, the Court granted the Debtors access to a portion of the cash collateral held to secure the Surety Bonds, subject to certain conditions.

6. July 31, 2004 was the most recent deadline for Tri–Union to satisfy its Offshore P & A Obligations.

If Tri–Union does not satisfy the Off-shore P & A Obligations, the MMS can make demand upon and sue to draw down on the Surety Bonds. *See* 30 C.F.R. 256.59. If Tri–Union cannot or does not extinguish its Offshore P & A Obligations, and if the Surety Bonds are not called, or if the Surety Bonds prove insufficient to pay for all P & A Operations, then the MMS may also call upon the Co–Lessees and Predecessors in Title for payment because such entities are co-responsible with Tri–Union. 30 C.F.R. 250.1701, 30 C.F.R. 256.62, 30 C.F.R. 256.64, and related authority.

On April 15, 2004, the MMS filed a Proof of Claim in the bankruptcy case (the "MMS Claim"). The MMS alleges that its $24.1 million claim is payable as an administrative expense entitled to priority distribution under § 507(a)(1) of the Bankruptcy Code. The Co–Lessees, the Predecessors in Title and Greenwich have also filed proof of claims. On January 29, 2004 Tri–Union filed its Objection and Motion for Order Disallowing Contingent Claims Held by (I) Greenwich Insurance Company, (II) Certain Co–Lessees, and (III) Certain Predecessors in Title Pursuant to Section 502(e). The parties have each filed cross motions for summary judgment and voluminous briefs regarding the motion.

### Summary Judgment Standard

"A motion for summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Pluet v. Frasier,* 355 F.3d 381, 383 (5th Cir.2004). An issue is material if its resolution could affect the outcome of the action. *Wyatt v. Hunt Plywood Co. Inc.,* 297 F.3d 405, 409 (5th Cir.2002). In deciding whether a fact issue has been created, the Court views the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party. *St. David's Health Care Sys. v. United States,* 349 F.3d 232, 234 (5th Cir.2003) (citing *Wyatt,* 297 F.3d at 409).

### 11 U.S.C. § 502(e)

The first issue presented by the parties is whether the Debtors' obligations to Greenwich, the Co-lessees and Predecessors in Title, must be disallowed under § 502(e).[7] Section 502(e) provides, in relevant part, as follows:

> Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that … such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution.

■ Because the respondents' proofs of claim satisfy FED. R. BANKR. P. 3001(f), the proofs of claim constitute *prima facia* evidence of the validity and amount of the claims. *See In re Beverages Int'l, Ltd.,* 50 B.R. 273, 276 (Bankr.D.Mass.1985) (noting debtor's objection to claim does not deprive the claim of presumptive validity). Thus, the burden for disallowance of the respondents' claims under § 502(e) is on Tri–Union.

■ As an initial matter, the parties dispute whether the respondents' claims are contingent. While the Court believes that the claims are likely to occur, for purposes of § 502(e)(1)(B), "contingent" in

---

7. Certain parties, notably Forest Oil, have already paid money on joint liabilities. The Debtors acknowledge that their motion for summary judgment is inapplicable to the extent that moneys have already been paid.

this context means "unfunded." Thus claims remain "contingent" for purposes of Bankruptcy Code § 502(e)(1)(B) until the co-debtor has paid the creditor. *See, e.g., In re Friendship Child Dev. Ctr.,* 164 B.R. 625 (Bankr.D.Minn.1992); *In re Amatex Corp.,* 110 B.R. 168 (Bankr.E.D.Pa.1990); *In re Early & Daniel Indus., Inc.,* 104 B.R. 963 (Bankr.S.D.Ind.1989); *In re Baldwin–United Corp.,* 55 B.R. 885 (Bankr.S.D.Ohio 1985). Because the MMS has yet to call on any of the respondents to fund the P & A Obligations, the P & A Obligations remain unfunded, and are thus contingent as envisioned by § 502(e).

 After determining that the claims are contingent, it is necessary to examine whether the responding parties are "liable with the debtor." In order for § 502(e)(1) to apply, "[t]here must exist ... a shared liability to the same party on the same claim." COLLIER ON BANKRUPTCY, Vol. 4 at ¶ 502.06[2][b]. Greenwich, the Co-lessees and the Predecessors in Title, (the "Respondents") acknowledge that the Respondents are liable for the P & A Obligations under state and federal law, and thus there is no real controversy. Regardless of this acknowledged joint liability, the Respondents allege their claims are not subject to § 502(e) disallowance under a "direct obligation theory." Under the direct obligation theory, the Respondents argue that the Debtors' independent contractual duty[8] to each respondent to perform the P & A Obligations comprises a direct claim against the Debtors. The Respondents then reason that this direct claim is not subject to § 502(e) disallowance because the claim does not meet the requirement of "liable with the debtor." Thus the Respondents essentially argue that their claims are not based on the joint obligation

to the federal and state agencies, but on the direct claims arising under their respective contracts.

As support for their direct obligation theory, the Respondents refer the Court to *In re Allegheny Intern.; Inc.* 126 B.R. 919 (W.D.Pa.1991). *Allegheny* involved a purchaser of contaminated real property filing a claim against the debtor to recover sums that the purchaser had expended and would expend in the future to remediate hazardous wastes at the purchased sites. *Id.* at 920. The debtor objected arguing that the claim was barred under § 502(e)(1)(B). *Id.* Deciding that § 502(e)(1)(B) did not disallow the claim, the Pennsylvania District Court's analysis focused on whether the purchaser was "liable with the debtor" to state and federal environmental agencies for the remediation costs. *Id.* at 920. The court reasoned that because the claim was based on a "direct action for recovery of response costs"—as authorized by federal statute—the claim was not the same as the environmental agency claims. *Id.* at 922. The court further noted, "[s]ection 502(e) is not a means of immunizing debtors from contingent liability, but instead protects debtors from multiple liability on contingent debts." *Id.* at 923. Thus, the Pennsylvania District Court ruled that § 502(e)(1)(b) does not apply to "direct" contingent claims. *Id.*

In making this decision however, the court expressed concern for the potential difficulty with its application stating:

> The bankruptcy court expressed concern that allowance of AL Tech's claims could result in double liability to the debtor if AL Tech fails to clean up the sites and the EPA then brings an action against debtor for remediation of the hazardous

---

8. Specifically, the parties reference various agreements in which the Debtors contractually agree to extinguish the P & A obligations.

It is uncontroverted that the Debtors owe direct obligations to each of the responding parties.

sites. Such possibility troubles this Court as well. However, the gravity of this possibility can be diminished. For example, the bankruptcy court may consider the fact that AL Tech might not incur future response costs when estimating AL Tech's claim pursuant to 11 U.S.C. § 502(c)(1). Additionally, as suggested by AL Tech, the bankruptcy court can require that any distributions on AL Tech's claim be placed in a trust to be expended on the remediation of the waste sites ... In the present case, use of a trust would be an effective means of guaranteeing that distributions on AL Tech's claim be used to remediate the waste sites. Such a trust would eliminate the potential for double recovery from the debtor for such remediation.

*Id.* at 925.

Like the Pennsylvania court, other courts have noted concern over possible double recovery. *See In re Cottonwood Canyon Land Co.,* 146 B.R. 992, 995–97 (Bankr.D.Colo.1992); *In re Eagle Picher Industries, Inc.,* 164 B.R. 265 (S.D.Ohio 1994). Specifically, the court in *Cottonwood* rejected the holding in *Allegheny* as error, noting that the *Allegheny* court's use of a trust device to avoid double recovery on the part of the debtor strongly suggests that the claimant was liable to both the EPA and the debtor for remediation, and therefore the claim should have been disallowed under § 502(e)(1)(B). *Id.*

While the Court agrees that the Respondents hold direct claims against the Debtors—per their various agreements—the key question before the Court is whether the existence of the direct claims precludes the application of § 502(e). Although the case law on this issue is admittedly mixed, the Court concludes that the existence of a separate, direct obligation does not eliminate the application of § 502(e). This determination does not preclude the Respondents from asserting direct claims that are not duplicative of those claims covered by § 502(e).

 Because of inconsistent case law on this issue, the Court begins its analysis of § 502(e) with the seminal bankruptcy decision on claim allowance and distribution: *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). *Pepper v. Litton* has long set the standard for a bankruptcy court's responsibility to assure that distributions out of a bankruptcy estate are fair and equitable, stating:

> [t]he bankruptcy courts have exercised [their] equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates. They have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.

*Id.* at 307–08, 60 S.Ct. 238. The bankruptcy courts' equitable power to eliminate certain duplicate claims is codified in § 502. As shown by the legislative history of § 502(e)(1)(B), this section was "enacted to prevent ... competition between a creditor and [its] guarantor for limited proceeds of the estate." H.R.Rep. No. 595, 95th Cong., 1st Sess. 354 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6310, S.Rep. No. 989, 95th Cong., 2d Sess. 65 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5851.[9] With this stated

---

**9.** *See e.g., In re Harvard Indus., Inc.,* 138 B.R. 10, 12 (Bankr.D.Del.1992) (noting the Court's primary concern in applying § 502(e)(1)(B) is preventing double payment of the estate of the same underlying liability). Thus, "[t]he co-liability requirement—that the claimant be 'liable with' the debtor on the claim of a third party creditor—illuminates the central purpose of § 502(e)(1)(B)." *In re Dant & Russell, Inc.,* 951 F.2d 246, 248 (9th Cir.1991).

purpose of preventing double payment, the Court must examine whether the Respondents' four claims are permissible under the direct obligation theory. Citing Collier for support of their direct obligation theory, Greenwich states: "[i]n order for § 502(e)(1) to apply, '[t]here must exist ... a shared liability to the **same party** on the **same claim**.'" Greenwich's Response to Debtor's Motion for Summary Judgment, docket no. 719 at ¶ 18 (citing COLLIER ON BANKRUPTCY, Vol. 4 at ¶ 502.06[2][b] ) (emphasis supplied in brief). Thus, the Respondents believe that their contractual agreements requiring extinguishment of the P & A Obligations—on which they are all admittedly liable under federal and state regulations—make the claims different. A closer analysis, however, shows two significant flaws with this argument.

▮▮▮▮ The first logical inconsistency is the Respondents' misunderstanding of the effect of their various agreements on underlying relationships. Traditionally, when a surety is compelled to pay debts for its principal, the surety is deemed entitled to reimbursement even without a contractual promise. *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). For example, in Greenwich's relationship as a surety,[10] there is no requirement that Greenwich and the Debtors enter into a separate obligation to protect Greenwich's right of reimbursement. Its suretyship rights exist under common law. *See* RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY, § 1 (Supp.1996) (stating that a surety relationship arises by operation of law where a party assigns contractual rights and duties to another); *see Memphis & L.R.R. Co. v.*

*Dow*, 120 U.S. 287, 301–02, 7 S.Ct. 482, 30 L.Ed. 595 (1887) (stating "[t]he right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties"). Indeed, the existence of reimbursement agreements is a relatively modern tool that is intended to document the common law obligation. Thus, this documentation is little more than an acknowledgement of the rights provided at common law, and an effort to make those rights more predictable. Such agreements neither create the right of reimbursement nor expand the rights granted to creditors under the Bankruptcy Code.

The second, and by far the more important inconsistency, lies in the application of the direct obligation theory. If the Court follows the direct obligation theory and finds that the Respondents' claims are not subject to § 502(e), the Court would have to allow both the Respondents' claims as well as the MMS claims, even though there would only be one expenditure to satisfy the P & A Obligations. Thus, when the Court allows for distributions on allowed claims, the estate would be taxed as many as **five times** for the single set of P & A Obligations. This result is inherently inequitable.

▮▮▮▮ Acknowledging this possibility, the Respondents—like the court in *Allegheny*—suggest that this Court employ its equitable power to create a trust fund to prevent dual distributions on the dual claims. *See Allegheny*, 126 B.R. at 923. Yet such a mechanism is not possible in a chapter 7 case.[11] Therefore, because

---

**10.** This analysis is applied with equal force to the Co–Lessees and Predecessors in Title because their agreements likewise implement

rights and obligations established by federal and state regulations.

**11.** In a chapter 7 case, distributions are made on allowed claims without the benefit of a

§ 502 has equal application in a chapter 7 as well as a chapter 11 case, the true test of whether the Respondents' claims should be allowed is what effect such allowance would have in a chapter 7 case.[12] Thus, for purpose of explanation, the Court has created an analysis of distributions in a hypothetical chapter 7 bankruptcy case.

This hypothetical assumes there are $1.8 million in funds for distribution in a chapter 7 liquidation. The only claims that are assumed to exist are (i) an $800,000 claim by a bank on a promissory note, payment of which is guaranteed by a third party letter of credit; (ii) an $800,000 claim by the issuer of the letter of credit pursuant to a letter of credit reimbursement agreement; and (iii) $1,200,000 in unsecured claims held by various trade creditors.

The hypothetical compares the results under a direct obligation theory with the application of § 502(e) without a direct obligation theory. The following chart exemplifies the Court's concerns:

| | | |
|---|---|---|
| TOTAL FUNDS FOR DISTRIBUTION | $1,800,000 | |
| CLAIMS UNDER RESPONDENTS' DIRECT OBLIGATION THEORY | | |
| Bank Claimant (Holding Letter of Credit) | $ 800,000 | |
| Letter of Credit Issuer (Holding § 502(e) Claim under Reimbursement Agreement; No Amount Funded) | $ 800,000 | |
| Trade Creditors | $1,200,000 | |
| TOTAL CLAIMS | $2,800,000 | |

| DISTRIBUTIONS UNDER RESPONDENTS' DIRECT OBLIGATION THEORY | DOLLARS | RATE |
|---|---|---|
| Bank | $ 514,286 | $0.64 |
| Letter of Credit Issuer | $ 514,286 | $0.64 |
| Trade Creditors | $ 771,429 | $0.64 |

| ALLOWED CLAIMS WITHOUT DIRECT OBLIGATION THEORY: | | |
|---|---|---|
| Bank Claimant (Holding Letter Of Credit) | $ 800,000 | |
| Letter of Credit Issuer (Holding § 502(e) Claim) | $ 0 | |
| Trade Creditors | $1,200,000 | |
| TOTAL CLAIMS | $2,000,000 | |

| DISTRIBUTIONS WITHOUT RESPONDENTS' DIRECT OBLIGATION THEORY: | DOLLARS | RATE |
|---|---|---|
| Bank | $ 720,000 | $0.90 |
| Letter of Credit Issuer | $ 0 | $0.00 |
| Trade Creditors | $1,080,000 | $0.90 |

RESULTS TO LETTER OF CREDIT ISSUER:

Direct Obligation Theory:

| | |
|---|---|
| Total Claim by Bank | $ 800,000 |
| Distributions by Debtor | -$ 514,286 |
| Draw On Letter of Credit | $ 285,714 |
| Distribution to Letter of Credit Bank | -$ 514,286 |
| Profit to Letter of Credit Issuer | $ 228,571 |

Without Direct Obligation Theory

plan of reorganization or the possible creation of a trust.

**12.** The confirmation provisions in chapter 11 *inter alia* require impaired claimants either to accept the plan or receive at least as much as they would have received under a hypothetical chapter 7. See 11 U.S.C. § 1129(a)(7)(A). Thus, the Court must measure a contested chapter 11 plan against a chapter 7 liquidation.

| | |
|---|---:|
| Total Claim by Bank | $ 800,000 |
| Distributions by Debtor | -$ 720,000 |
| Draw On Letter of Credit | $ 80,000 |
| Distribution To Letter of Credit Bank | $ 0 |
| Profit/Loss To Letter of Credit Issuer | -$ 80,000 |

As shown in the above chart, under the direct obligation theory, the trade creditors receive a distribution that is 26% less than the trade creditors would receive under the standard application of § 502(e). Moreover, under the direct obligation theory, the letter of credit issuer would receive a distribution of $228,000 **MORE** than the letter of credit issuer funded. Such a result cannot be the law's intention. This result violates the principals of *Pepper v. Litton*, it is inconsistent with the plain wording of the statute, and it is simply bad policy.

Indeed, a letter of credit issuer—like Greenwich in this case—accepts the market risk of the debtor's failure by pricing its fee based on the probability of a default. Thus, by factoring a probability of default into the fee, it is only fair to defer to the allocation of risk and potential benefit that was the outcome of the parties' negotiations. In the hypothetical above, the letter of credit issuer has negotiated a bilateral obligation with the Bank. As a result of that bilateral obligation, it loses a hypothetical $80,000.

The facts of this case—although far more complex—demand the same result. This estate should not be required to bear the P & A Obligation cost more than one time. If the estate extinguishes the P & A Obligation by a distribution to the MMS, there is no reason to pay each respondent the same amount.

■ Of course, this holding does not preclude the Respondents' claims that are wholly separate from those obligations on which there is direct liability. Although the parties have not fully informed the Court as to the full extent of those obligations, the Court is not intending to preclude such items as interest and bond charges that are independent obligations to the Respondents. With respect to these charges, Tri–Union is liable to the Respondents, and the Respondents have no co-liability to any other party.[13] Accordingly, they are not governed by § 502(e).

■ Moreover, the Court believes that sound policy dictates the allowance of the charges that do not represent joint obligations. As set forth in detail above, the purpose of § 502(e) is to assure that multiple parties are not given distributions for the same liability. Allowed charges held by the Respondents are presumably market driven charges, properly imposed. If, for example, Greenwich has a prepetition bond fee that was due and not paid, the bond fee was earned prepetition and reflects a fair market charge for the coverage provided by the bond. There is no "double charging" to pay Greenwich's bond fee and to allow a claim in favor of the MMS. The only "double charging" in that example would be if Greenwich and the

---

**13.** The Court expresses no view on whether these charges are otherwise allowable. The allowance of such charges on a prepetition basis may be apparent to the parties. The allowance of charges that have accrued postpetition is not so apparent and the parties will be required to address those charges in subsequent pleadings. For example, the charges may be governed by § 365 if obligations are assumed; they may be governed by § 506(b) if there is adequate security for postpetition fees, costs and charges, and they may be governed by other provisions of the Bankruptcy Code.

MMS were both paid a distribution based on the claim that represents the P & A Obligation.

### Greenwich's Secured Claims

Greenwich alleges that § 502(e) does not apply to the extent that Greenwich is secured. The Debtors allege that Greenwich is not secured, but fail to provide any substantive legal argument in support of their position that—to the extent that Greenwich is secured— § 502(e) is inapplicable.

■■■ Greenwich cites the Court to § 506(d)(1) in defense of its lien. The Court agrees. Greenwich's liens survive the determination that Greenwich's claims are disallowed under § 502(e)(1). Greenwich may retain its lien position until such time as its contingent liability is eliminated.

### Subrogation

■■■ The parties agree that payment by the Respondents to the MMS to satisfy the P & A Obligations subrogates the paying parties to the MMS's claim and priority for the amounts funded. The parties disagree as to whether the Respondents are subrogated to the police power of the MMS upon payment. At oral argument and in its briefs, counsel for Greenwich

argued that 31 U.S.C. § 9309 [14] subrogates the Respondents to the police power of the MMS. Based on a plain reading of § 9309, the Court finds that this statute and the cases cited by Greenwich do not subrogate the Respondents to the police powers of the MMS, but merely to the claim and priority of the MMS. This reading comports with *In re J. Menist*, 289 F. 229 (2d Cir.1923)—the principal case relied on by the Debtors. In *In re J. Menist*, the court interpreted a similar statute [15] and noted the following:

> while it is admitted that the surety company succeeded to all the rights of the United States against the Bankrupt, it is not our understanding that section 3468, upon which the surety company so confidently relies, was intended to confer or does confer all the advantages which the United States might assert against the bankrupt. The section referred to merely gives to the surety the right to bring suit in its own name for the recovery of all moneys which the surety has paid, and it gives him in addition the same priority in the assertion of that right which is given to the United States.

*Id.* at 231.

Like the Court in *In re J. Menist*, this Court finds that the Respondents are not

---

14. Section 9309 states, "[w]hen a person required to provide a surety bond given to the United States Government is insolvent or dies having assets insufficient to pay debts, the surety, or the executor, administrator, or assignee of the surety paying the Government the amount due under the bond—(1) has the same priority to amounts from the assets and estate of the person as are secured for the Government; and (2) personally may bring a civil action under the bond to recover amounts paid under the bond."

15. This section, § 3468 of the Revised Statutes states, "[w]henever the principal in any bond given to the United States is insolvent, or whenever, such principal being deceased,

his estate and effects which come to the hands of his executor, administrator, or assignee, are insufficient for the payment of his debts, and, in either of such cases, any surety on the bond, or the executor, administrator, or assignee of such surety pays to the United States the money due upon such bond, such surety, his executor, administrator, or assignee, shall have the like priority for the recovery and receipt of the moneys out of the estate and effects of such insolvent or deceased principal as is secured to the United States, and may bring and maintain a suit upon the bond, in law or equity, in his own name, for the recovery of all moneys paid thereon."

subrogated to the police powers of the MMS, but rather that the Respondents are only subrogated to the priority and claims of the MMS.

### Subordination under § 509(c)

Debtors request that the Court subordinate Greenwich's claim under § 509(c) until such time as the MMS claim is paid in full. Section 509(c) states:

> [t]he court *shall subordinate* to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is *paid in full,* either through payments under this title or otherwise.

11 U.S.C. § 509(c) (emphasis added). Accordingly, the Debtors argue that the Greenwich claim is subject to mandatory subordination to the MMS claim until the MMS is "paid in full." Thus, under Debtors' theory, even if Greenwich satisfies its entire obligation under the bonds, Greenwich's claim is still subordinated until payment is made in full.

 The narrow issue of whether a surety's claim must be subordinated after the surety has fully funded its obligation is an issue of first impression that requires the Court to interpret § 509(c). When engaging "[i]n statutory interpretation, 'the starting point is the language of the statute.'" *United States v. Chavarria,* 377 F.3d 475, 2004 WL 1551371 (5th Cir.2004) (citing *United States v. John,* 935 F.2d 644 (4th Cir.1991)). Moreover, acts of Congress should be fairly read to effectuate congressional intent. *See United States v. Hernandez–Avalos,* 251 F.3d 505 (5th Cir.

2001) *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43 & n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (citations omitted)("If the intent of Congress is clear, that is the end of the matter; for the court ... must give effect to the unambiguously expressed intent of Congress.... If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect").

Employing the foregoing rules of construction, the Court notes that the plain language of § 509(c) states that a creditor's subrogation claim is subject to mandatory subordination to the prior creditor's claim until the prior creditor's claim is "paid in full."[16] Thus, under the plain language of the statute, it appears that the complete satisfaction of the surety obligation does not except the surety from subordination. This reading is somewhat buoyed by the legislative history which states:

> It is desirable to preserve present law to the extent that a surety or codebtor is not permitted to compete with the creditor he has assured until the assured party's claim has paid in full. Accordingly, section 509(c) of the House amendment subordinates both a claim by way of subrogation or a claim for reimbursement or contribution of a surety or codebtor to the claim of the assured party until the assured party's claim is paid in full.

*In re Kuhn Const. Co., Inc.* 11 B.R. 746 (Bankr.W.Va.1981) (citing 124 Cong. Rec. H 11,094 (Sept. 28, 1978); S 17,410–11 (Oct. 6, 1978)).

 Nevertheless, the Court finds that neither the plain wording of the stat-

---

**16.** The Court notes the Second Circuit's decision in *In re Chateaugay Corp.,* 94 F.3d 772, 779–80 (2d Cir.1996) (holding the "paid in full" language is satisfied even if the underlying claim is settled for less than the original claim).

ute nor the legislative history resolve a difficult interpretive question: Is the "claim" the entire claim held by the United States, both assured and unassured, or only the assured portion? The Debtors request that the Court apply the subordination provisions to the entirety of the United States' claim, both assured and unassured. The Debtors' argument disregards § 502(e)(2). Section 502(e)(2) states "[a] claim for reimbursement or contribution of such an entity that becomes fixed after the commencement of the case shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) of this section, the same as if such claim had become fixed before the date of the filing of the petition." 11 U.S.C. § 502(e)(2). Accordingly, under § 502(e), a surety that funds its obligations postpetition must be treated the same as a surety who funds its obligations prepetition. Section 509—by its terms—only applies to a co-debtor. If a surety fully funds its suretyship obligation prior to bankruptcy, the subordination provisions of § 509(c) would not apply. Because § 502(e)(2) requires that a funded suretyship be treated as if the payment were made prepetition, there can be no difference. Consequently, if the Court requires Greenwich to both pay its assured obligations and to be subordinate to the remaining unassured portion of the MMS Claim, the surety would be treated differently than if it had funded the obligation prepetition. Such a result is contrary to § 502(e) and violates the rule of statutory construction requiring the Court to interpret the statute in its entirety. *See Mississippi Poultry Ass'n, Inc. v. Madigan,* 31 F.3d 293 (5th Cir.1994) (noting statutes should be interpreted so as not to render one part inoperative); *see e.g. United States v. Caldera–Herrera,* 930 F.2d 409 (5th Cir.1991) (noting where possible, statutes must be read in harmony with one

another so as to give meaning to each provision); *First Nat. City Bank v. Compania de Aguaceros, S.A.,* 398 F.2d 779 (5th Cir.1968) (effect should be given to all of provisions of a statute, if reasonably possible); *General Motors Acceptance Corp. v. Whisnant,* 387 F.2d 774 (5th Cir. 1968) (every part of statute must be viewed in connection with whole so as to harmonize all parts, if practicable, and give sensible and intelligent effect to each, for it is not to be presumed that Legislature intended any part of statute to be without a meaning).

The Bankruptcy Code—and the case law interpreting it—frequently require the Court to treat a claim according to its constituent parts. For example, § 506 provides for the treatment of a partially secured claim pursuant to its secured and its unsecured components; § 507(a)(8) provides for the treatment of a claim for federal income taxes as a priority claim (if it meets the standards in § 507(a)(8)) and as a general unsecured claim otherwise; a claim for $6,000 in current wages, for example, is treated as a priority claim to the extent of $4,925 and a general unsecured claim to the extent of $1,1075. *See* 11 U.S.C § 507(a)(3). Accordingly, the bifurcation established by the integration of § 502(e)(2) with § 509 is consistent with the application of other provisions of the Bankruptcy Code.

Although the Court believes that its statutory analysis determines the § 509 issue raised by the Debtors, the Court has additionally analyzed the economic realities of the Debtors' position. As set forth below, economic realities require a fully paid suretyship claim to be treated by its constituent parts.

■■■ The Court believes that it makes little commercial sense to utilize the Debtors' interpretation. The purpose of the

claim allowance and priority provisions of the Bankruptcy Code is to provide an equitable distribution of Estate assets. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). To utilize the Debtors' interpretation would provide a windfall to creditors with partially secured claims. If an unsecured creditor negotiates a pre-bankruptcy debt guaranty—and the guarantor fully performs—the Debtors would nevertheless penalize the guarantor by subordinating the guaranty claim until all unsecured creditors were fully paid.[17] The result creates a windfall at the expense of the guarantor. This result would be contrary to other provisions of the Bankruptcy Code, such as § 502(e). Again, the Court believes that a hypothetical example would best serve this analysis. Utilizing a similar example as above, this hypothetical assumes that there are $1.8 million in funds for distribution in a chapter 7 liquidation. The only claims that are assumed to exist are (i) a $1,000,000 claim by a bank on a $1,000,000 promissory note, payment of $800,000 of which is guaranteed by a third party letter of credit; (ii) an $800,000 claim by the issuer of the letter of credit pursuant to a letter of credit reimbursement agreement; and (iii) $1,000,000 in unsecured claims held by various trade creditors.

The hypothetical compares the results under a full subordination theory (i.e., the letter of credit issuer is subordinated to payment of an additional $200,000 to the Bank) with a theory that subordinates only to full payment of the $800,000 letter of credit. The following chart exemplifies the Court's concerns:

| | | |
|---|---|---|
| Total Funds for Distribution | $1,800,000 | |
| Claims under Debtors' Full Subordination theory | | |
| Bank Claimant (Having received proceeds of letter of credit) | $ 200,000 | |
| Letter of Credit Issuer (Fully funded, but subordinated) | $ 0 | |
| Trade Creditors | $1,000,000 | |
| Total Senior Unsecured Claims | $1,200,000 | |
| Total Subordinated Claims | $ 800,000 | |
| | | |
| Distributions under Debtors' Full Subordination Theory | Dollars | Rate |
| Bank | $ 200,000 | $1.00 |
| Letter of Credit Issuer | $ 0 | $0.00 |
| Trade Creditors | $1,000,000 | $1.00 |
| Subordinated Letter of Credit Issuer | $ 600,000 | $0.75 |
| | | |
| Allowed Claims Partial Subordination Theory: | | |
| Bank Claimant (Having received proceeds of letter of credit) | $ 200,000 | |
| Letter of Credit Issuer (Fully funded, but subordinated) | $ 800,000 | |
| Trade Creditors | $1,000,000 | |
| Total Claims | $2,000,000 | |

**17.** The Debtors' brief apparently requests that the subrogees' rights would be subordinate to *all* unsecured creditors. The Debtors allege that the MMS is a general unsecured creditor. Under the Debtors' theory, the MMS would receive distributions as a general unsecured creditor. Under that theory—unless general unsecured creditors receive full payment—the subrogees would receive no distributions. The Court's hypothetical example is intended to exemplify the error in the Debtors' request. The alternative interpretation of § 509(c) is that the subordination is *only* as to the MMS claim. Under that interpretation, payments otherwise payable to the subrogees would merely be redirected to the MMS. Under that application of § 509(c), the windfall would fall entirely to the MMS—and would be on the unassured portion of its claim. The Court believes that the latter interpretation—i.e., the redirection of payments—is the correct interpretation for a partially funded suretyship.

| Distributions With Partial Subordination Theory: | Dollars | Rate |
|---|---|---|
| Bank | $ 180,000 | $0.90 |
| Letter of Credit Issuer | $ 720,000 | $0.90 |
| Trade Creditors | $ 900,000 | $0.90 |

Results To Trade Creditors:

Full Subordination Theory:

| Total Claim by Trade | $1,000,000 |
|---|---|
| Distributions by Debtor | $1,000,000 |

With Partial Subordination Theory

| Total Claim by Trade | $1,000,000 |
|---|---|
| Distributions by Debtor | $ 900,000 |

In this hypothetical, the trade creditors were not parties to the letter of credit arrangement. Utilizing the Debtors' interpretation, the trade creditors would receive a $100,000 windfall at the expense of the letter of credit issuer. This result is the inverse of the problem correctly avoided by the Debtors' § 502(e) interpretation set forth above. There is no indication that Congress intended such an unfair result.

The result advocated by the Debtors would drive up the commercial costs of suretyships with no concomitant benefit.

The Court finds further justification for this application of § 509(c) in *U.S. v. National Surety Co.*, 254 U.S. 73, 41 S.Ct. 29, 65 L.Ed. 143 (1920). In *National Surety,* the Court was faced with whether to give a surety who completely funded its bond obligation the same priority as the United States under § 3468 (the same statute examined by the Second Circuit in *Menist*) when the bond was insufficient to satisfy the government's claim against the principal. *Id.* The Court held that the subrogation provision was implemented—notwithstanding the government's priority rights. However, the surety's rights under the subrogation provision were subordinated to the government's rights *based solely on the government's sovereignty.*

In holding that the surety's *subrogation* rights were nevertheless *subordinated* to the rights of the United States under § 3486, the Court stated as follows:

The priority secured to the United States by section 3466 is priority over all other creditors; that is, private persons and other public bodies. This priority the surety obtains upon discharging its obligation. But what the surety asks here is not to enjoy like priority over such other creditors, but equality with the United States, a creditor whose debt it partly secured. To accord such equality would abridge the priority expressly conferred upon the government. While the priority given the surety by the statute attaches as soon as the obligation upon the bond is discharged, it cannot ripen into enjoyment unless or until the *whole debt* due the United States is satisfied. This result is in harmony with a familiar rule of the law of subrogation under which a surety liable only for part of the debt does not become subrogated *to collateral or to remedies available to the creditor unless he pays the whole debt* or it is otherwise satisfied.

*Id.* at 75, 41 S.Ct. 29(emphasis added).

 The Court notes the confusion that may result from applying a case dealing principally with *subrogation* to an is-

sue of *subordination.* Subrogation occurs when an entity steps into the shoes of a creditor, typically by payment of a debtor's obligation to the creditor. *See Putnam v. Commissioner,* 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956); *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). Subordination is the ordering of priority of debts between creditors. *See In re Mobile Steel Co.,* 563 F.2d 692 (5th Cir.1977); *Sampsell v. Imperial Paper and Color Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941). However, in *National Surety,* the effect of the Supreme Court's ruling was that a party *subrogated* to the statutory creditor rights of the United States was nevertheless *subordinated* to the United States' remaining statutory rights as a creditor until such time as the United States was paid in full. *Id.*

The *subordination* in *National Surety* arose because of the priority given to the sovereign under then existing law. As set forth below, the priority of the MMS's claim may be subject to a similar level of priority. If the MMS's claim is subject to a sovereign-like priority, then the MMS's claim will be fully paid before distributions to other creditors. *Id.* Under such a circumstance, the parties who are subrogated to the MMS's rights would be next in line for payment based on the MMS' priority. *Id.* However, if the MMS's claims are not entitled to sovereign-like priority, the subrogee's rights (following full payment of their obligations) will be *pari passu* with the MMS.

### Priority and Status of Plugging and Abandonment Obligation

The Court recognizes that the disputes resolved in the previous part of this opinion are peripheral to the central issue: are the Debtors required to pay for the P & A Obligations or should the obligations be passed to others?

The P & A Obligations may constitute an administrative expense of the estate. The obligation may be a prepetition claim which can largely be shed by abandonment of the wells. Finally, the obligation may reflect a future expenditure that the Debtor will be required to make; if so, the feasibility of that expenditure will be an issue at plan confirmation.

The Debtors and Greenwich have filed directly contradictory affidavits concerning whether the plugging and abandonment issues constitute a pressing environmental issue requiring immediate attention.

The Court has carefully reviewed the many authorities provided by the various parties. The issues that must be reconciled by the Court will be substantially different if the Court concludes that there is an imminent threat to the environment rather than a long-term concern that may never pose a serious environmental issue. The Court declines to issue an advisory opinion on the full range of factual possibilities. At confirmation, the Court will consider the nature of the environmental threat and how the Debtors' plan proposes to address the environmental issue.

The balance of the motion and cross-motion are premature until the Court determines the factual issues concerning the severity and immediacy of the environmental threat.

Summary judgment on the premature issues is denied.