# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00042-CV

---

**P. J. S., Appellant**

**v.**

**K. S. S., Appellee**

---

### FROM THE 126TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-18-003258, THE HONORABLE LAURIE EISERLOH, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

During their divorce proceedings, P.J.S. ("Paul")[1] and K.S.S. ("Kimberly") executed a Partition Agreement Incident to Divorce (PAID) to divide their sizeable community estate. After the parties' divorce was finalized, Kimberly sued Paul to enforce the PAID, claiming, *inter alia*, that he had failed to pay her the monthly "Guaranteed Amount" to which she was entitled under Section 4.5 of the PAID. The parties filed competing motions for summary judgment, and the trial court granted Kimberly's and denied Paul's.

By two issues, Paul contends that the trial court erred by: (1) granting Kimberly's motion for summary judgment, as the PAID unambiguously provides that Paul is not obligated to pay the Guaranteed Amount to Kimberly when Net Profits from Operating Distributions do not

---

[1] *See* Tex. Fam. Code § 09.002(d) ("On the motion of the parties or on the court's own motion, the appellate court in its opinion may identify the parties by fictitious names or by their initials only.").

yield a positive amount, or, alternatively, the PAID is ambiguous; and (2) awarding Kimberly her attorney's fees pursuant to Section 6.5 of the PAID and Section 9.014 of the Family Code. *See* Tex. Fam. Code § 9.014 (authorizing trial court to award reasonable and necessary attorney's fees in suits to enforce divorce decree). Because we conclude that the provision of the PAID at issue unambiguously obligates Paul to pay the Guaranteed Amount even in months where Net Profits from Operating Distributions do not yield a positive amount, and because attorney's fees were authorized in this instance, we affirm.

## I.    BACKGROUND

In 2016, prior to the parties' divorce, Paul pledged certain collateral to Privateer, such as his membership and partnership interests in certain businesses, in exchange for a $1,000,000 line of credit with PlainsCapital Bank. Per the terms of this agreement, if Paul became a party to divorce proceedings, Privateer was entitled to terminate the agreement. To prevent Privateer from exercising this remedy during the parties' divorce, both Kimberly and Paul signed an amendment to the 2016 agreement with Privateer, which, according to the amendment, was "executed contemporaneously" with the PAID. Privateer agreed to waive its right to terminate the 2016 agreement as a result of the divorce proceedings and, in exchange, Kimberly acknowledged and agreed that her "rights to the payments described in Sections 2.5, 4.4, and 4.5 of the PAID are subordinate to Privateer's rights to all amounts owed to Privateer under the Agreement (as amended hereby)."

As part of their divorce settlement, Paul and Kimberly executed the PAID to effectuate an equitable distribution of their marital estate. In addition to dividing the parties' community property and debt, the PAID contemplated that Paul would make certain payments to

2

Kimberly after the parties' divorce was finalized. Section 4.4. of the PAID provided that Paul, "[a]s consideration for the division of property and other agreements made," agreed "to pay [Kimberly] an amount equal to: (a) 50% of the Net Profits from each Liquidating Distribution, but in no event more than $20,000,000 in the aggregate plus the amount of any Contingent Liability Payments . . . ; and (b) 50% of the Net Profits from each Operating Distribution, but in no event more than twenty thousand dollars ($20,000) per month."

Section 4.4 further defined "Net Profits" to mean

an amount equal to the profit realized by [Paul] from any Liquidating Distributions or Operating Distributions after the return of all capital contributions (other than capital contributions made by the parties' community estate) and payment of all actual expenses and liabilities relating to the entities and assets from which the Liquidating or Operating Distributions are derived, as well as all Required Payments . . . .

A "Required Payment" was defined as:

any payment required to be made in connection with the following the [sic] agreements and any of their related notes, guaranties, security agreements or other loan documents: (a) that certain Assignment of Rights to Distributions between [Paul] and Privateer Alternative Investments dated July 12, 2016; (b) that certain Assignment of Distributions between PJS Holdings, LP, 07 Holdings, LLC, and Veritex Community Bank dated December 8, 2017; (c) that certain Assignment of Distributions to JML UT Foundation Gift I, LLC, dated December 29, 2017; and (d) that certain Assignment between PJS Holdings, LLC and the KSS 2011 Irrevocable Trust.

Section 4.5, the provision at issue, entitled "Guaranty of Net Profits from Operating Distributions" provides:

As further consideration for the division of property and other agreements made in this PAID, to the extent that [Kimberly] does not receive monthly payments of Net Profits from Operating Distributions under Section 4.4(b)

3

equal to the applicable Guaranteed Amount . . . , [Paul] guarantees that he will pay the shortfall (i.e., on a monthly basis, [Paul] will pay the difference, if any, between the applicable Guaranteed Amount and the amount of Net Profits from Operating Distributions actually paid to [Kimberly] during the prior month), subject to any obligation to make Required Payments, which shall take priority over the payments required by this Section.

The "Guaranteed Amount" was defined by the PAID as $11,500, unless Kimberly remarried, and would be "reduced, pro rata, by the ratio between the aggregate payments made pursuant to Section 4.4(a) and $5,000,000."

More than two years after the divorce was finalized, Kimberly sued Paul, asserting that he violated the PAID by failing to make consistent payments of the Guaranteed Amount of $11,500 per month. The parties filed competing motions for summary judgment, both asserting that the plain and unambiguous meaning of the PAID entitled them to relief. Kimberly argued that the "subject to" language in Section 4.5 referred to the order in which payments were to be made; e.g., first, the Required Payments, and second, the payments of the Guaranteed Amount. However, she contended that the unambiguous language of the PAID still required both payments to be made, regardless of whether Net Profits from Operating Distributions went entirely to satisfying Required Payments.

For his part, Paul did not dispute that he had not made payments of the Guaranteed Amount to Kimberly. Rather, according to Paul, the unambiguous meaning of Section 4.5 paused Paul's obligation to pay the Guaranteed Amount when the amount generated in Net Profits was not sufficient to fully cover Required Payments. Both parties attached the PAID to their motions. The trial court granted Kimberly's traditional motion for summary judgment and denied Paul's.

4

Paul filed a motion for reconsideration or clarification of the court's summary judgment. Attached to Paul's motion was the 2016 agreement made with Privateer and a notice of default sent by Privateer, which informed the parties that the court's summary judgment "jeopardizes Privateer's rights under the terms of the [agreement] and thereby damages Privateer if it is interpreted to override the priority of distributions in consideration of Required Payments, which Privateer asserts is a material breach of the [agreement]." The trial court denied Paul's motion for reconsideration.

Privateer and KSS Texas Investment Holdings, LLC (Holdings, LLC)[2] later intervened in the enforcement suit, arguing that Kimberly's interpretation of the PAID could lead Paul to default on the obligations owed to them. Privateer later nonsuited, representing that it had received assurances that "neither party is seeking to change or modify their existing contractual agreements with Privateer."

The parties proceeded to a bench trial on attorney's fees, as well as ancillary issues that are not disputed in this appeal. Paul filed a motion for new trial which was denied by operation of law. This appeal followed.

## II.    STANDARD OF REVIEW & APPLICABLE LAW

"A settlement agreement is a contract, and its construction is governed by legal principles applicable to contracts generally." *Austin Tr. Co. v. Houren*, 664 S.W.3d 35, 42 (Tex. 2023). Likewise, "[c]ourts construe unambiguous guaranty agreements as any other contract." *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014). "If the meaning of a guaranty agreement is uncertain, 'its terms should be given a construction which is most

---

[2] Holdings, LLC represented that it was a joint obligor with Kimberly and Paul on certain negotiable instruments.

favorable to the guarantor.'" *Id.* (quoting *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999)). "A guarantor's obligations will not be extended by implication beyond the precise written terms of the guaranty contract." *Pham v. Mongiello*, 58 S.W.3d 284, 288 (Tex. App.—Austin 2001, pet. denied).

"The construction of an unambiguous contractual provision—meaning that the provision has only one reasonable construction—is an issue of law we review de novo using well-settled contract-construction principles." *Samson Expl., LLC v. Bordages*, 694 S.W.3d 195, 200 (Tex. 2024). "A contract is not ambiguous merely because the parties disagree about its meaning." *Id.* A contract is ambiguous only if it "is subject to two or more reasonable interpretations after applying the pertinent rules of construction." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). When interpreting a contract, we consider the entire agreement and, to the extent possible, resolve any conflicts by harmonizing the agreement's provisions. *Occidental Permian, Ltd. v. Citation 2002 Inv. LLC*, 689 S.W.3d 899, 905 (Tex. 2024). This approach requires us to give effect to all provisions of the contract so that none will be rendered meaningless. *Id.*

In interpreting a contract, "context matters." *U.S. Polyco, Inc. v. Texas Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 390 (Tex. 2023). "[A] 'vital part' of a text's context is 'the *purpose* of the text,' as gathered 'from the text itself, consistently with other aspects of its context.'" *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 808 (Tex. 2023) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 323 (2012)). "The 'facts and circumstances' extant at the time a contract is executed may be consulted only to inform the meaning of the language the parties chose to effectuate their accord." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). But "[i]n construing

6

an unambiguous contract or in determining whether an ambiguity exists, courts may not seek the parties' intent beyond the meaning the contract language reasonably yields when construed in context." *Id.*

We review the trial court's summary judgment de novo. *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 252 (Tex. 2023). A traditional motion for summary judgment requires the moving party to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). "If the movant carries this burden, the burden shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment." *Lujan*, 555 S.W.3d at 84. We indulge every reasonable inference and resolve any doubts in the nonmovant's favor and take as true all evidence favorable to the nonmovant. *Mosaic Baybrook One*, 674 S.W.3d at 252. The non-movant has no burden to respond to or present evidence regarding the motion, unless and until the movant has carried its burden to conclusively establish the cause of action on which the motion is based. *Id.* When, as here, both parties move for summary judgment on the same issues and the trial court grants one motion and denies the other, "the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

### III.   ANALYSIS

By his first issue, Paul contends that the grant of summary judgment was improper, as the correct interpretation of Section 4.5 of the PAID obligates him to pay the

Guaranteed Amount to Kimberly only when Net Profits from Operating Distributions yield a positive amount after Required Payments are made.

We turn first to the text at issue. Paul argues that the phrase "subject to any obligation to make Required Payments, which shall take priority over the payments required by this Section" eliminates his obligation to "pay the shortfall" between the Guaranteed Amount and Net Profits actually paid to Kimberly each month. We interpret the phrase "subject to" in context to determine its meaning. *See Occidental Permian*, 689 S.W.3d at 908. "The words 'subject to,' used in their ordinary sense, mean subordinate to, subservient to or limited by." *Wenske v. Ealy*, 521 S.W.3d 791, 796 (Tex. 2017) (quoting *Kokernot v. Caldwell*, 231 S.W.2d 528, 531 (Tex. App.—Dallas 1950, writ ref'd)). But in other circumstances, the words "subject to" may be used to notify a party of "a right or obligation attendant to the property conveyed." *Occidental Permian*, 689 S.W.3d at 908. Here, based on context, we conclude that the words "subject to" are used in their ordinary sense; meaning that Paul's obligation to pay Kimberly the Guaranteed Amount was made subordinate to his obligation to make Required Payments.

However, Paul's interpretation, that payments of the Guaranteed Amount were not only subordinate to, but were also entirely dependent on Required Payments, would require us to read words into the parties' PAID. Nowhere in the agreement did the parties agree that Paul's obligation to pay the Guaranteed Amount would only spring into existence if Net Profits yielded a positive amount. Section 4.5 defines the shortfall as "the difference, if any, between the applicable Guaranteed Amount and the amount of Net Profits from Operating Distributions *actually paid* to K.S. during the prior month." (Emphasis added.) The PAID does not include any language expressly requiring that amount to be positive.

8

Moreover, the very phrase "Net Profits," per the terms of the PAID, already takes into consideration Paul's obligation to make Required Payments. Specifically, the definition of "Net Profits" subtracts from gross profits "all Required Payments." In other words, unless Paul first satisfies his obligation to make "all Required Payments," one cannot even calculate the shortfall between the Guaranteed Amount and "the amount of Net Profits from Operating Distributions actually paid to [Kimberly] during the prior month." If the parties intended to require Guaranteed Payments only when profits from Operating Distributions exceeded Required Payments, using Net Profits—which already take into account Required Payments—to calculate the shortfall was a circuitous way to do so.

As previously stated, we conclude that the unambiguous meaning of Section 4.5 of the PAID subordinates payments of the Guaranteed Amount to Kimberly to the Required Payments. However, a subordination agreement "is nothing more than a contractual modification of [debt] priorities and must be construed according to the expressed intention of the parties and its terms." *ITT Diversified Credit Corp. v. First City Cap. Corp.*, 737 S.W.2d 803, 804 (Tex. 1987); *see In re Tri-Union Dev. Corp.*, 314 B.R. 611, 627 (Bankr. S.D. Tex. 2004) ("Subordination is the ordering of priority of debts between creditors."). "An obligation may be issued as subordinated to performance of another obligation of the person obligated, or a creditor may subordinate its right to performance of an obligation by agreement with either the person obligated or another creditor of the person obligated." Tex. Bus. & Com. Code § 1.310.

Simply because one debt is subordinated to another does not necessarily mean that a debtor is excused from paying the subordinated debt while the senior debt is outstanding. There are two basic types of subordination agreements: an "inchoate," or partial, subordination agreement and a complete subordination agreement. Dee Martin Calligar, *Subordination*

9

*Agreements*, 70 Yale L. J. 376, 377 (1961). Under a partial subordination agreement, the senior creditor may allow the subordinated debt to be paid off in its entirety. *Id.* Because an inchoate type of subordination agreement may limit the amount of capital available to pay down the senior creditor's debt in the case of insolvency, senior creditors "often include in loan agreements provisions which limit payments or prepayments of the subordinated debt to an agreed basis." *Id.* at 380. The junior creditor risks recovering no funds at all if the debtor becomes insolvent and is unable to fully satisfy the senior debt. On the other hand, under a complete subordination agreement, "no payment of principal or interest on the subordinated debt is permitted so long as the debtor is obligated to the senior creditor, or so long as a specifically identified senior debt remains unpaid." *Id.* at 377.

We do not interpret the subordination agreement in the present case as a complete subordination agreement, nor does either party champion such an interpretation. Neither do we interpret Section 4.5 as placing Kimberly *pari passu* with the third-party creditors. Rather, under the terms of the PAID, should Paul fail to make Required Payments, Kimberly's ability to collect the Guaranteed Amount owed to her shall be subordinated to the third-party creditors' right to collect the debt owed to them. *See Echols v. Professional Fin. Assocs.*, 607 S.W.2d 292, 295 (Tex. App.—Texarkana 1980, writ ref'd n.r.e.) ("If appellee's asserted interpretation of the note is upheld, the subordination clause will, in effect, cancel the promise to pay. If the clause is interpreted as 'inchoate', as appellants suggest[], effect is given to both the promise to pay and the subordination clause. When so interpreted, the terms of the note are neither ambiguous nor conflicting."); *cf. In re Aktiebolaget Kreuger & Toll*, 96 F.2d 768, 770 (2d Cir. 1938) ("Subordination to the general creditors of the participating debentures would be meaningless in a solvent corporation . . . .").

But the terms of the PAID are not so broad as to suggest that the parties intended to pause the Guaranteed Amount payments while the Required Payments exceeded Net Profits from Operating Distributions. Indeed, the PAID acknowledged that the obligation to pay Guaranteed Amounts would otherwise be active during the "Guaranty Period." Per the PAID, this period began on January 1, 2019, and would terminate on the occurrence of certain events, such as the elapse of eleven years, Kimberly's death, or payment of an aggregate total of $5 million pursuant to other provisions in the PAID. If the parties had intended to create a complete subordination agreement, they could have added the caveat that the Guaranty Period would not *begin* until Paul had paid in full the debt owed to the third parties. *Cf. Shawn Ibrahim, Inc. v. Houston-Galveston Area Loc. Dev. Corp.*, 582 S.W.3d 753, 769 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (subordination agreement specifically precluded Standby Creditor from "accept[ing] . . . further payments on the Standby Debt except as permitted in the [Debenture Guarantee]" and "tak[ing] . . . action to enforce claims against Standby Debtor on the Standby Debt, without written consent from [Senior Creditor], until the CDC Loan is satisfied"); *Smith v. MLC Cavalli, LLC*, No. 05-21-00659-CV, 2023 WL 4396049, at *2 (Tex. App.—Dallas July 7, 2023, no pet.) (mem. op.) (terms of subordination clause provided that "[i]nterest and principal payments on this Note shall only be made by [Cavalli] to [Smith] as permitted by the Senior Lender, which could mean that no payments shall be made hereunder unless and until all indebtedness and liabilities, whether now or in the future existing, of [Cavalli] to Senior Lender have been paid in full and Senior Lender has no further commitment or obligation to [Cavalli]").

In considering the contract as a whole, we note that there is nearly identical subordinating language found in the indemnification clause of the PAID:

11

> [E]ach party . . . covenants and agrees that, if any claim, action or proceeding is hereafter made or initiated by a third party seeking to hold the other party . . . liable for any debt partitioned to the Indemnifying Party hereunder or incurred by the Indemnifying Party . . . , the Indemnifying Party shall, at his or her sole expense, defend the other against any such claim, action or proceeding, whether or not well-founded, and indemnify and hold harmless the Indemnified Party in respect to damages, costs, and expenses, including attorneys' fees . . . resulting therefrom.
>
> Notwithstanding anything to the contrary in the foregoing or any other provision of this agreement, (a) if a claim, action, or proceeding arises from or relates to any entity or asset (including P.S.'s ownership or management thereof) from which Liquidating or Operating Distributions are directly or indirectly produced, then any defense costs incurred and amounts owed by P.S. under this provision (i) will be treated as expenses and deducted when calculating the amount of the Net Profits from Liquidating or Operating Distributions under Section 4.4, and (ii) may be set off from any payment owed to K.S. under Section 4.4; and (b) *any right of K.S. to indemnification under this agreement shall be subordinate to any obligation of P.S. to make any Required Payments . . . .*

(Emphasis added.)

Paul does not discuss why the reasoning of his interpretation of the subordinating language in Section 4.5 should not also be applied to this subordinating language. And to that end, were we to accept Paul's interpretation of the subordinating language, unless and until the amount of the Required Payments was less than the amount of expenses generated from the claim, action, or proceeding for which Kimberly should be indemnified, Paul would have no obligation to indemnify her whatsoever, regardless of his solvency. Such an interpretation runs counter to the plain text of this section, which modifies, but does not purport to pause, debt priorities. *See ITT Diversified Credit Corp.*, 737 S.W.2d at 804.

12

Paul also argues that the title of Section 4.5, "Guaranty of Net Profits from Operating Distributions," "limits the source" of Kimberly's Guaranteed Payments—"they can only come from Net Profits, so if there are no Net Profits, there can be no § 4.5 '[p]ayments of Net Profits.'" Thus, according to Paul, "As defined in the PAID, 'Net Profits' come exclusively from the Operating Distributions, not from Paul personally."

But the PAID specified that Kimberly was simply entitled to "an amount equal to" 50% of Net Profits from each Operating Distribution. Nowhere in the PAID did Kimberly agree to limit the sources of funds to those derived from Liquidating or Operating Distributions specifically. To the extent the title of Section 4.5 may suggest otherwise, which we do not hold it does, the actual text of the contractual clauses must control. *See RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015) ("[T]itles and headings are not determinative, and when they are inconsistent with the plain meaning of the provision's operative language, we afford greater weight to the operative language.").

And, to that end, in Section 4.4, Paul specifically agreed to "personally" make payments under Sections 4.4 and 4.5 "from the property *partitioned* to him," not necessarily from funds disbursed to him via Operating Distributions. (Emphasis added.) Stated otherwise, Paul agreed to be personally liable for the Guaranteed Amount and to use any funds available to him by virtue of the PAID—that were not already set aside for Required Payments—to satisfy this liability. *See Henry v. Masson*, 333 S.W.3d 825, 847 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("The fact that the Agreement provides for the payment of debts from the sale of Partnership property does not mean that the sale of Partnership property was the only source of funds to pay those debts."); *Taylor-Made Hose, Inc. v. Wilkerson*, 21 S.W.3d 484, 488 (Tex. App.—San Antonio 2000, pet. denied) ("By agreeing to 'personally . . . pay' North

13

American Transit's delinquent account, Wilkerson made herself personally liable for the corporation's debt.").

Moreover, Kimberly specifically

> acknowledge[d] and agree[d] that she has no rights in funds required to be used to satisfy any Required Payments and that her rights to the payments described in Section 4.4. and Section 4.5 below are otherwise subordinate to the rights of the payees of Required Payments, including, without limitation, Privateer Alternative Investments, Veritex Community Bank, and IMI UT Foundation Gift I, LLC, and the KSS 2011 Irrevocable Trust.

In other words, if certain funds—like the disbursement funds pledged as collateral in the Privateer agreement—were dedicated entirely to the Required Payments, Kimberly would have no ability or authority to collect the debt owed to her from those funds, regardless of whether those funds consisted of Operating Distributions.

There being no indication in the PAID that the subordination clause was anything other than an expression of debt priority in the case of Paul's insolvency, we conclude that the agreement to subordinate Paul's guaranty to the rights of the third-party creditors is a partial subordination agreement that only contemplates a cessation of payment when Paul cannot satisfy his obligation to the senior creditors. To that end, because there is no evidence of Paul's insolvency, we conclude that the trial court did not err by determining that Paul's obligation to pay the Guaranteed Amount was still active.

Paul argues in the alternative that if we do not accept his interpretation of the PAID as correct, the PAID is at least ambiguous. In support of this argument, Paul cites *Coker v. Coker*, wherein the supreme court analyzed a divorce decree that awarded to wife "those certain commissions and accounts receivable heretofore earned by husband during his

14

employment with the firm of Majors and Majors in connection with the sale of the 'Jinkens Ranch property in Tarrant County, Texas[.']'" 650 S.W.2d 391, 392 (Tex. 1983). The parties agreed that wife would be entitled to "such future commission or account receivable being in the approximate sum of $25,000." *Id.* They also agreed that "[i]n the event, for any reason she fails to receive such installments of commission exactly as husband would have prior to his assignment of his rights thereto to wife, husband agrees to pay wife in Dallas County, Texas all such sums of money, which she has failed to receive, up to the guaranteed sum of $25,000.00." *Id.* at 393.

The supreme court concluded the provision at issue was ambiguous and thus precluded summary judgment, as it "could be construed as a guarantee by Mac that Frances would receive $25,000 or merely a promise that he would not interfere with the payments made by Majors & Majors to her after they received commission from the seller." *Id.* at 394. This same ambiguity does not persist in the agreement before us. In *Coker*, the husband assigned wife his right to receive commission from a third party. *Id.* at 392. In the present case, under the PAID, Kimberly was explicitly not given "any rights to or interest in any particular entity." The amount required to be paid under "Sections 4.4–4.8 and 4.10" was a debt Paul specifically took responsibility for in the divorce decree. Paul was guaranteeing to pay a debt—Net Profits from Operating Distributions—for which Kimberly could already collect only from Paul. *Cf. Jamshed v. McLane Exp. Inc.*, 449 S.W.3d 871, 877 (Tex. App.—El Paso 2014, no pet.) ("A guaranty creates a secondary obligation under which the guarantor promises to answer for the debt of another and may be called upon to perform once the primary obligor fails to perform."); *Eubank v. First Nat'l Bank of Bellville*, 814 S.W.2d 130, 133 (Tex. App.—Corpus Christi–Edinburg 1991, no writ) ("By definition, [a guaranty] is an undertaking by a third person to another to answer for

15

the payment of a debt, incurred by a named person, in the event that the named person fails to pay."). Paul does not proffer an alternative interpretation to the one we have already rejected, and we note that it would not be reasonable to construe the guaranty here as Paul's agreeing not to interfere with Kimberly's right to receive the Guaranteed Amount from him, or as a guaranty of a debt Paul already owed to Kimberly. *See TWI XVIII, Inc. v. Carroll*, No. 02-12-00065-CV, 2013 WL 1457725, at *5 (Tex. App.—Fort Worth Apr. 11, 2013, pet. denied) (mem. op.) ("The appellants' construction, that Texas Wings was guarantying its own performance under a lease between itself and Carroll, is not a reasonable interpretation."). Accordingly, we conclude that *Coker* does not command a different result here.

We conclude that the trial court did not err by granting Kimberly's motion for summary judgment and denying Paul's. We overrule Paul's first issue.

By his second issue, Paul argues that the trial court's award of attorney's fees was improper. However, Paul has conceded, both in his briefing and at oral argument, that if we conclude that summary judgment was proper, his second issue fails. Accordingly, because we conclude that the trial court's summary judgment was proper, we overrule Paul's second issue. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

## IV.    CONCLUSION

We affirm the trial court's judgment.

_____

Maggie Ellis, Justice

Before Justices Kelly, Ellis, and Jones*

Affirmed

Filed:   January 30, 2026

*Before J. Woodfin Jones, Chief Justice (Ret.), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).